JUSTICE COTTER,
concurring in part and dissenting in part.
¶134 I concur with the majority opinion’s conclusions through ¶ 93. However, I dissent from the Court’s decision to remand this matter for *44 a new trial based on the District Court’s decision to admit the TARP evidence. Consequentially, I would reach the remaining issues presented by the parties concerning the District Court’s rulings on evidence and the general verdict form, and I would affirm in part and reverse in part.
¶135 Although I agree that the District Court abused its discretion in allowing the jury to consider the TARP evidence, Opinion, ¶ 100,1 cannot agree with the majority’s assertion that the "prejudicial effect of the TARP evidence requires a new trial.” Opinion, ¶ 107. In concluding that the admission of TARP evidence compels a reversal, the majority selectively blends evidence concerning an internal Comerica Special Handling Group with the wholly unrelated availability of TARP funds so as to create a picture that the evidence did not actually paint. Opinion, ¶ 105.
¶136 As the majority notes, the formation of a special handling group was announced by Comerica in December 2008. Comerica vice-president Sheehan testified that this group would be handling accounts that were undergoing various levels of financial distress. Both Sheehan and Comerica President Michael Ritchie told the jury that this special handling group commenced operations in the first quarter of 2009, which was shortly after the Masters’ accounts were swept. Sheehan testified that this group could have been of assistance to Masters had its assets not already been seized.
¶137 The fact that the Bank decided in 2008 to form this special handling group was clearly admissible to demonstrate that at the time it was announcing plans to assist other troubled customers, it was moving to liquidate Masters’ assets. Neither party argued that TARP money had any bearing on the Bank’s decision to sweep Masters’ accounts or its contemporaneous plans to come to the aid of other distressed Comerica borrowers. The Special Handling Group and TARP were simply not related.
¶138 As the District Court found when denying the Bank’s post-trial motions, Masters did not claim entitlement to the TARP funds, nor did it contend that Comerica was obligated to extend them. Moreover, in response to inquiries from Masters and Comerica, Barofsky categorically concluded that Comerica used TARP funds appropriately. He testified:
[Masters] Q. In your opinion, could Comerica have used TARP funds to assist Masters in 2008?
[Barofsky] A. If they had chosen to, they could have.
[Masters] Q. Was it required?
[Barofsky] A. It was not required.
*45 [Masters] Q. Was it prohibited?
[Barofsky] A. It was not prohibited.
[Comerica] Q. And banks such as Comerica that received TARP funds had broad discretion on how they could use those funds, right?
[Barofsky] A. Yes, very broad.
[Comerica] Q. And there’s nothing inappropriate about the way Comerica handled the money, right?
[Barofsky] A. No.... no, there’s absolutely nothing inappropriate. Comerica also elicited testimony from its own witness Ritchie, who stated that Comerica “invested most of the TARP funds back into mortgage backed securities, which again was part of the design of the program” and explained that Comerica never specifically applied TARP funds to “any specific individual customer” like Masters. Comerica reiterated on closing argument, citing to Barofsky’s testimony, that “the bank was under no obligation to use that money for individual loans such as Masters” and that Barofsky had agreed that the funds were used squarely within the purposes of TARP. Notably, Masters did not argue to the contrary. In voir dire and again during opening statements, counsel told the jury very clearly that it was not claiming that Comerica was under an obligation to lend TARP money to Masters.
¶139 The District Court instructed the jury on the law in the case, and none of the instructions invited the jury to consider TARP evidence and/or award damages as a result of the failure to extend TARP funds. Further, witnesses for both parties concurred that there was no private cause of action under TARP. We presume the jury follows the law. See State v. Hagen, 2002 MT 190, ¶ 50, 311 Mont. 117, 53 P.3d 885.
¶140 Finally, although the Court concludes at ¶ 107 that there is a reasonable possibility that the TARP evidence contributed to the verdict, it does not suggest in what particulars the verdict might have been tainted. I submit that Comerica has not established how it was harmed by the admission of the evidence. As explained below, while I and those joining this dissent would uphold the jury’s award of principal and interest and lost profits, we would vacate the award of punitive damages as well as the award of consequential damages. Of the damages awarded, it was these awards that could have been susceptible to inflation should the jury have harbored an instinct to punish Comerica for not extending TARP funds to Masters. By contrast, the remaining awards of the jury were calculated to the dollar *46 upon the losses to which lay and expert witnesses testified. I therefore submit that any potential harm predicated upon admission of the TARP evidence would be eliminated by virtue of reversal of the more elastic awards of consequential and punitive damages.
¶141 I therefore believe that the court overstates the impact of the TARP evidence and arguments. I also disagree with the majority’s melding of the TARP evidence with evidence concerning the Bank’s Special Handling Group, and its conclusion that it was the TARP evidence that was “conceivably outcome-determinative” of the jury’s conclusion that Comerica failed to act in good faith in its dealings with Masters.
¶142 In sum, I would conclude that the District Court abused its discretion when it allowed TARP evidence to be presented to the jury, but conclude that the error was harmless as Comerica has not carried its burden of proving prejudice. See Rocky Mt. Enters. v. Pierce Flooring, 286 Mont. 282, 294, 951 P.2d 1326, 1333 (1997) (“No civil case shall be reversed by reason of error which would have no significant impact upon the result. Where there is no showing of substantial injustice, the error is harmless and may not be used to defeat the judgment.”). As a consequence, I would reach the other issues presented by the parties and would affirm the District Court’s remaining decisions concerning its evidentiary rulings and use of the general verdict form.
¶143 I would uphold the jury’s $5,433,910 award for “Principal and interest on funds wrongftdly offset” and the $19,603,683 award for “Lost profits or other future gain,” which were premised upon “hard evidence” of actual damages supported by substantial expert and lay testimony. I would vacate the award of $16,500,000 in consequential damages because it stemmed wholly from the brief testimony of two guarantors who complained about the emotional impact of having their accounts swept. The award is unsupported in the record, there was no jury instruction defining or differentiating between consequential and other damages, and under both Montana and Michigan law, the Guarantors could not lawfully assign their personal injury claims to Masters. I would also vacate the punitive damages award because the stand-alone tort claims should not have been presented to the jury, and there can be no award of punitive damages stemming from the breach of contract claims.
¶144 This was a hard-fought case. While some mistakes were made, there was substantial evidence placed before the jury to support its verdict for breach of contract and the covenant of good faith and fair dealing and for the awards entered for Masters’ economic losses. I *47 believe the Court errs in concluding that the admission of the TARP evidence is sufficient to wipe out that verdict and compel a retrial of this complicated matter. I therefore strongly dissent from the Court’s reversal and remand for new trial.
CHIEF JUSTICE McGRATH and JUSTICE WHEAT join in the concurring and dissenting Opinion of JUSTICE COTTER.